# No. 25-50049

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHRISTOPHER FILLINE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Texas

**BRIEF OF DEFENDANT-APPELLANT**

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

KRISTIN M. KIMMELMAN
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

### UNITED STATES v. CHRISTOPHER FILLINE,
### No. 25-50049

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Christopher Filline,** Defendant-Appellant;

2. **Justin R. Simmons,** Interim U.S. Attorney;

3. **Margaret Leachman,** former Acting U.S. Attorney;

4. **Jaime Esparza, Gregg N. Soffer,** and **John F. Bash,** former U.S. Attorneys;

5. **Christina L. Playton,** Assistant U.S. Attorney, and **Gregory J. Surovic,** former Assistant U.S. Attorney, who represented Plaintiff-Appellee in the district court;

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Molly L. Roth,** Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

i

8. **Kristin M. Kimmelman,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Christopher Filline requests oral argument. A jury found him guilty of conspiracy to commit wire fraud after a three-day trial, even though the government did not prove the existence of a common agreement by alleged co-conspirators to commit wire fraud. Oral argument will help the Court apply its precedent to the facts of this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..............................i

STATEMENT REGARDING ORAL ARGUMENT .......................iii

TABLE OF AUTHORITIES................................................. v

SUBJECT MATTER AND APPELLATE JURISDICTION ............ 1

ISSUE PRESENTED FOR REVIEW .............................. 2

INTRODUCTION ...................................................... 3

STATEMENT OF THE CASE ....................................... 5

    A.  Indictment............................................. 5

    B.  Trial. ...................................................... 5

    C.  Sentencing............................................. 14

SUMMARY OF THE ARGUMENT ................................ 16

ARGUMENT AND AUTHORITIES ............................... 17

Insufficient evidence supports Mr. Filline's conviction of
conspiracy to commit wire fraud.......................... 17

A.  Standard of review. ............................................ 17

B.  The government failed to prove the existence of the wire
fraud conspiracy. ................................................ 18

CONCLUSION.......................................................... 25

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*Ingram v. United States*,
  360 U.S. 672 (1959) ................................................................ 24

*Kotteakos v. United States*,
  328 U.S. 750 (1946) ................................................................ 23

*United States v. Adkinson*,
  158 F.3d 1147 (11th Cir. 1998) ........................................... 19, 22

*United States v. Alvarez*,
  610 F.2d 1250 (5th Cir. 1980) .................................................. 18

*United States v. Beacham*,
  774 F.3d 267 (5th Cir. 2014) ............................................... 17, 18

*United States v. Brooks*,
  681 F.3d 678 (5th Cir. 2012) ............................................... 18, 19

*United States v. Chandler*,
  388 F.3d 796 (11th Cir. 2004) .................................................. 23

*United States v. Falcone*,
  311 U.S. 205 (1940) ................................................................ 23

*United States v. Ganji*,
  880 F.3d 760 (5th Cir. 2018) ............................................... 19, 22

*United States v. Grant*,
  683 F.3d 639 (5th Cir. 2012) .................................................... 19

*United States v. Greenlaw*,
  84 F.4th 325 (5th Cir. 2023) .................................................... 19

*United States v. Johnson*,
  439 F.2d 885 (5th Cir. 1971) .................................................... 22

*United States v. Palacios,*
  556 F.2d 1359 (5th Cir. 1977) .................................................... 24

*United States v. Pearson,*
  667 F.2d 12 (5th Cir. 1982) ....................................................... 19

*United States v. Sanders,*
  952 F.3d 263 (5th Cir. 2020) ............................................... 18, 24

*United States v. White,*
  569 F.2d 263 (5th Cir. 1978) .......................................... 22, 24, 25

**Statutes**

18 U.S.C. § 1343 ................................................................... 5, 17

18 U.S.C. § 1349 ..........................................................5, 17, 18, 19

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 3742 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................ 1

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ..................................................... 1

Fed. R. App. P. 32(a)(5) ........................................................... 26

Fed. R. App. P. 32(a)(6) ........................................................... 26

Fed. R. App. P. 32(a)(7)(B) ...................................................... 26

Fed. R. App. P. 32(f) ................................................................ 26

**Other Authorities**

5th Cir. Jury Pattern Instructions (Criminal) § 2.57 (2024) ........ 19

## SUBJECT MATTER AND APPELLATE JURISDICTION

**1. Subject matter jurisdiction in the district court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court exercised jurisdiction under 18 U.S.C. § 3231.

**2. Jurisdiction in the court of appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas, entering a judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). Here, the judgment was entered on January 27, 2025. ROA.14. Mr. Filline filed a notice of appeal the next day. ROA.15, 436. Also on January 28, the court entered an amended judgment. ROA.15.

1

2

## ISSUE PRESENTED FOR REVIEW

A jury convicted Mr. Filline of conspiracy to commit wire fraud. The issue on appeal is: did the government present insufficient evidence that Mr. Filline entered into an agreement with someone else to commit wire fraud?

## INTRODUCTION

In June 2016, Christopher Filline reported that his 2007 Lincoln Navigator had been stolen. After making this report, Mr. Filline filed a claim with his insurance company. A few days later, he discovered that the car had been completely burned in a remote part of nearby Bexar County. The arson sparked investigations by both the fire marshal and the insurance company. But the arson investigations fizzled out. Within a few months, the insurance company paid out the claim of over $14,000 which paid off the outstanding lien on the car. Meanwhile, the Fillines were making payments on their new car.

Two years later, the arrest of Oscar Hernandez on unrelated matters reignited the arson investigation. Hernandez was a known criminal in the area, and he was also the cousin of Ambrose Rymers, an animal control officer for the Castroville, Texas, police department. Hernandez's post-arrest statements led the deputy fire marshal to interview Rymers. After denying any involvement in the 2016 arson, Rymers eventually said that Mr. Filline, who was the Castroville police chief, had asked him to get one of his cousins to get rid of the car. This led to Mr. Filline's indictment for conspiracy to commit wire fraud.

At Mr. Filline's 2024 trial, Rymers testified that Mr. Filline asked him to get rid of the car and cautioned him to never speak about it again. Rymers knew the Fillines had financial struggles, such as overdrawn bank accounts and medical bills, but he did not know about any missed car payments or the insurance policy for the Navigator. He only knew that Mr. Filline wanted to get rid of the car, and he agreed to make that happen. Rymers recruited Hernandez to help him take the car, but he was surprised that Hernandez set it on fire. Neither Hernandez nor Mr. Filline testified.

Mr. Filline moved for judgment of acquittal several times, arguing that the government had not proven beyond a reasonable doubt any agreement to commit wire fraud. The district court denied those motions, and the jury convicted Mr. Filline of wire fraud conspiracy. He was sentenced to three years' probation. On appeal, Mr. Filline again argues that the government presented insufficient evidence of any agreement between Mr. Filline, Hernandez, or Rymers to commit wire fraud. Because the jury's verdict rests on conjecture and speculation, the Court should vacate his conviction.

4

## STATEMENT OF THE CASE

### A. Indictment.

In January 2020, the Grand Jury returned a one-count indictment against Christopher Filline and Oscar Hernandez. ROA.20–23. It alleged that, between June 2016 and December 2016, Mr. Filline and Hernandez agreed together and with others to commit wire fraud. ROA.22–23; *see* 18 U.S.C. §§ 1343, 1349. The indictment alleged that Mr. Filline developed a scheme to defraud Farmers Insurance Group, which insured his 2007 Lincoln Navigator, by claiming the car had been stolen even though he had arranged for Hernandez and another person to destroy it. ROA.21. Mr. Filline electronically submitted an insurance claim to Farmers stating that the car had been stolen. ROA.21. The Farmers insurance center in Oklahoma City, Oklahoma, later processed and paid approximately $14,000 for the claim. ROA.21–22.

### B. Trial.

The jury trial began on October 8, 2024, and lasted three days.[1] ROA.10–11. The jury heard that Mr. Filline moved from northern

---

[1] Mr. Filline was released on bond after his initial appearance. ROA.3, 31–32.

Texas to the nearby town of Lytle, Texas, in 2013, when he became the police chief of Castroville, Texas. ROA.665, 970, 989, 1123–24, 1132, 1141. The Castroville police department was relatively small, with a handful of officers working out of a building no bigger than the courtroom. ROA.915, 1019; *see* ROA.1435 (Gov't Ex. 17). One of those officers, Gary Dean Russell, had been the interim chief and wanted to be chief. ROA.970. When Mr. Filline was hired instead, Russell continued to work as a sergeant with the department, but he disliked Mr. Filline. ROA.968.

In 2016, the Fillines were struggling financially, largely due to Mr. Filline's wife's medical issues. ROA.927. Mr. Filline discussed those financial problems with colleagues at the police department. *See* ROA.917, 975–76, 1018–19, 1022. He also complained to coworkers that the shocks on his wife's car, a 2007 Lincoln Navigator, were shot and would cost about $2,000 to repair. ROA.918, 977, 1023–24; *see also* ROA.933, 938. Mr. Filline told colleagues and friends that he wanted someone to get rid of the Navigator for him. ROA.919, 933, 940. For instance, after the Navigator broke down one weekend, Mr. Filline texted his mechanic Blake Chandler asking if he could come burn it, adding "LOL." ROA.933–34. Most people understood these comments to be jokes. *See* ROA.933, 940, 1025.

6

One officer at the time, however, testified that he eventually thought Mr. Filline was serious about wanting someone to get rid of the Navigator. ROA.1025–26. Ambrose Rymers was a Castroville native, who joined the Castroville police department as an animal control officer after Mr. Filline became chief. ROA.1015. Fellow officers knew Rymers had family members who were involved in criminal activities. ROA.920, 980; *see* ROA.1008–09.

Mr. Filline asked Rymers to get one of his cousins to "take care of the vehicle and get rid of it." ROA.1025; *see also* ROA.919. Mr. Filline did not promise Rymers anything in exchange. ROA.1026. Rymers said he knew Mr. Filline was asking him to commit a crime, although Rymers never explained what type of crime it was. ROA.1026. Rymers said he felt bad for Mr. Filline, given his financial issues, and knew that he needed help. ROA.1026. He had heard Mr. Filline complain about mortgage payments and having overdrawn his bank account by a couple of thousand, but he did not remember Mr. Filline complaining about car payments. ROA.1019.

About two weeks before the Lincoln Navigator was reported stolen and found destroyed, Rymers contacted his cousin Oscar Hernandez and told him "that the chief wanted to get rid of the vehicle."

7

ROA.1027. Hernandez said he would help, even though Rymers did not promise Hernandez anything in exchange. ROA.1027–28.

Rymers testified that Mr. Filline told him where the Navigator would be parked—at the police station—and that the keys would be inside. ROA.1029–30. Mr. Filline told Rymers that they would never talk about this again and that if he told anyone, Mr. Filline would kill him. ROA.1029.

According to Rymers, in the early morning hours of Saturday, July 16, 2016, Rymers watched Hernandez pick up the Navigator from the police station and followed him to a dead-end road in nearby Bexar County. ROA.1033–34. Rymers saw Hernandez pour something on the car and then light it on fire. ROA.1035. He said he did not realize that Hernandez was going to burn it; he thought Hernandez would sell it. ROA.1035. Hernandez did not testify. *See* ROA.369.

On Monday, July 18, 2016, around 4 p.m., Mr. Filline reported the car stolen to the Lytle police department. ROA.666, 684. He told the officers that he noticed the car missing from his property on Saturday but was busy with work and thought one of his older sons may have taken it. ROA.667, 689; *see* Gov't Ex. 13. He did not

realize that his son had not borrowed the car and that it was missing until late Sunday or early Monday. ROA.669–71, 689, 1431.

On Tuesday, July 19, 2016, Mr. Filline submitted a report online to Farmers claiming that the Navigator was stolen. ROA.805–06, 1304. His claim representative was in Oklahoma City and communicated with him via email. ROA.806, 811–12; *see* ROA.1288.

Meanwhile, on that Saturday, July 16, the Bexar County fire department was called to the site where the Navigator was burned to put out the resulting grass fire. ROA.709. A few days later, on July 21, the deputy fire marshal Marcel Garcia inspected the car, which had been moved to a tow yard. ROA.712. After finding the VIN number, Garcia discovered that the car belonged to Mr. and Mrs. Filline and had been reported as stolen. ROA.712–14. No parts of the car appeared to be missing, and Garcia could not tell if the ignition had been tampered with because the vehicle had been totally burned. ROA.715–16. Garcia opened an investigation into the arson and interviewed Mr. Filline and others. ROA.717–19, 723. Garcia also learned that the Fillines had missed some payments on the car loan, although they were current when the car was stolen. ROA.722–27, 795.

Mr. Filline learned that the car was found on July 21 and emailed Farmers the next day. ROA.716, 1517. Farmers investigated the claim. ROA.818–74. Ultimately, Farmers paid off the remaining loan for the Navigator, approximately $14,000.[2] ROA.869–75; *see* ROA.1428.

The arson investigation remained open, but there were no developments in the case until two years later when Hernandez was arrested on unrelated charges. ROA.729–30, 757. Hernandez spoke briefly to one of the back up officers, Dorsey Krause, who then called Sergeant Russell to tell him that he needed to speak with Hernandez. ROA.950–51, 959–60. Mr. Filline, who was still the police chief, also went to the arrest scene and briefly spoke to Hernandez.[3] ROA.924, 951. Mr. Filline then called Russell also telling him that Hernandez wanted to speak to "Sarge." ROA.998–99.

Sergeant Russell later interviewed Hernandez and then contacted the Bexar County fire marshal about the 2016 arson of Mr.

---

[2] Farmers calculated the approximate pay-off amount for the loan as $14,725.91. The trial exhibits include a payment of $13,879.50 from Farmers to the lien holder for the Lincoln Navigator. ROA.1428. The district court ultimately imposed restitution of $14,388.25. ROA.443.

[3] The government presented no evidence about what Mr. Filline and Hernandez may have said during this short interaction. *See* ROA.951.

Filline's car, and Garcia reopened the investigation. ROA.757–60, 960, 981–83. Garcia interviewed Rymers again, who repeatedly denied any wrongdoing. But after hours of interrogation, a visit to the burn site, and prayers with Garcia, Rymers eventually said that he had recruited Hernandez to get rid of Mr. Filline's Navigator back in 2016. ROA.762–72, 1042–50. Based on those statements, Garcia referred the case to federal authorities. ROA.731.

Meanwhile, Rymers returned to work at the Castroville police department the day after he had confessed to Garcia. ROA.1052. He went into Mr. Filline's office to explain why he had disappeared the previous afternoon and secretly recorded their conversation. ROA.1053–54; *see* Gov't Ex. 19. In that conversation, Mr. Filline wondered why the investigation was open again, why Rymers was taken for questioning without giving Mr. Filline—his boss—any advance notice, and what they (Rymers and Mr. Filline) were going to do about it. ROA.1437–38. Mr. Filline also asked Rymers if they had asked him about his cousin or brothers. ROA.1438. Mr. Filline repeated twice that he and Rymers had nothing to do with this. ROA.1437–38.

Eventually, Mr. Filline lost his job as police chief and was indicted for conspiracy to commit wire fraud. ROA.22–23, 971; *see*

11

*also* ROA.1138. Rymers also lost his job as an animal control officer. ROA.1013. The jury learned that Rymers had pleaded "guilty to conspiracy" before Mr. Filline's trial, and that the "conspiracy involved the burning of the vehicle." ROA.1014. Rymers said he was conspiring with Mr. Filline and Hernandez. ROA.1014.

The defense called two witnesses: Mr. Filline's wife, Lynda, and his father, Thomas Filline. ROA.581, 1119. Mrs. Filline testified about how much she loved the Navigator and how disappointed she was with the car they bought after the Navigator was stolen. ROA.1134–35, 1152. In her words, she "got an ugly brown Tahoe to replace my beautiful Lincoln," and they were paying more on the Tahoe than they had been on the Lincoln. ROA.1134–35. She also explained that, during the summer of 2016, they were downsizing to a smaller home and coordinating the closing on the new home while selling their old home. ROA.1133–34, 1148. Both witnesses described how much Mr. Filline loved working on project cars. ROA.1114, 1126, 1130–32; *see also* ROA.928. He had about six cars when the Navigator was taken. ROA.672, 928, 1130. And Thomas Filline described his comfortable financial affairs, million-dollar ranch, and how he had loaned money to—and been repaid by—his

son in the past and could have easily loaned him money in 2016. ROA.1111, 1113.

Mr. Filline moved for judgment of acquittal both at the close of the government's case and after the defense had presented witnesses. ROA.362, 1092, 1180. Mr. Filline challenged the sufficiency of the evidence generally. ROA.362, 1092, 1180. He also argued that the government had not proven that Mr. Filline agreed with anyone else to commit wire fraud. ROA.363–66. The district court denied those motions.[4] ROA.12, 1092, 1180.

In closing, the government argued that Mr. Filline conspired with Hernandez and Rymers to defraud Farmers by arranging to have the Navigator stolen so that the lien would be paid. ROA.1199. The prosecutor emphasized the Fillines' financial difficulties, how they benefited from the car being stolen, Mr. Filline's two-day delay reporting the car stolen, perceived inconsistent statements, and his reaction when Rymers told him in 2018 that the fire marshal was still investigating the theft of the Navigator. ROA.1207–16. The government concluded that, "Ambrose Rymers told the truth. He

---

[4] The district court also denied Mr. Filline's post-verdict motion for judgment of acquittal post-verdict. ROA.423; *see* ROA.392–402.

13

and his cousin took the vehicle. They destroyed it at the direction of Mr. Filline so that Mr. Filline could get out from underneath that lien." ROA.1219.

The defense argued there was no evidence that Mr. Filline, Hernandez, and Rymers ever agreed to commit wire fraud. ROA.1235–36. The defense also noted that Hernandez and Rymers benefited in no way from taking or destroying the Navigator, Mr. Filline could have asked his wealthy father for a loan if needed, and Sergeant Russell disliked Mr. Filline and wanted him out of the Castroville police department. ROA.1220–22, 1235–40.

The jury deliberated for a few hours that afternoon and again the next morning. ROA.1249–52. The jury ultimately returned a guilty verdict. ROA.383, 1256.

**C. Sentencing.**

At sentencing, the district court adopted the presentence report's Guidelines range of zero to six months' imprisonment. ROA.1528. Mr. Filline requested a sentence of probation, emphasizing his lack of criminal history and his stellar pretrial conduct. ROA.1706–12. The government argued for an upward departure to 12 months' imprisonment because Mr. Filline had been a police chief. ROA.1268–70. The court imposed a sentence of three years'

probation. ROA.440, 1272. The court also imposed restitution of $14,388.25, which Mr. Filline paid that day, and a fine of $5,000. ROA.443, 1272. Mr. Filline appealed. ROA.436.

## SUMMARY OF THE ARGUMENT

**Insufficient evidence supports Mr. Filline's conviction of conspiracy to commit wire fraud.**

A jury found Mr. Filline guilty of conspiracy to commit wire fraud. This conviction requires proof that the conspirators entered into a common agreement to commit wire fraud and shared a specific intent to defraud. But the government merely presented evidence that Mr. Filline asked Ambrose Rymers to get rid of or destroy the Lincoln Navigator. There was insufficient evidence that Rymers or anyone else knew that the purpose of getting rid of the Navigator was to commit wire fraud. Because the jury's verdict impermissibly rested on speculation and conjecture that two or more people agreed to commit wire fraud, the conviction must be vacated.

16

## ARGUMENT AND AUTHORITIES

**Insufficient evidence supports Mr. Filline's conviction of conspiracy to commit wire fraud.**

Mr. Filline was charged with conspiring to commit wire fraud. §§ 1343, 1349; ROA.22–23. Conviction of this charge required proof that two or more people agreed to commit wire fraud and shared a specific intent to defraud. The government presented evidence that Mr. Filline asked Rymers to "get rid of" one of his cars. But there was no evidence that Rymers or his cousin Hernandez knew that the purpose of taking the car was to commit wire fraud. Indeed, neither Rymers nor Hernandez received anything or was promised consideration to "get rid of" the car. Because there was insufficient evidence that Mr. Filline *agreed* with Rymers, Hernandez, or anyone else to *commit fraud*, the Court must vacate his conviction.

### A. Standard of review.

Mr. Filline moved for judgment of acquittal, ROA.1092, 1180, so his sufficiency challenge is reviewed de novo. *See United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014). The Court construes all evidence in favor of the jury verdict. *Id.* But reversal is required if a rational trier of fact could not have "found the essential elements of the offense to be satisfied beyond a reasonable doubt." *Id.* While

17

a jury can "choose among reasonable constructions of the evidence," "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Sanders*, 952 F.3d 263, 273–75 (5th Cir. 2020) (cleaned up).

### B. The government failed to prove the existence of the wire fraud conspiracy.

"To be convicted of conspiracy under § 1349, the jury must find: (1) two or more persons *agreed to commit fraud*; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose." *Beacham*, 774 F.3d at 272 (emphasis added). Conspiracy also requires "the level of intent required for proving the underlying substantive offense." *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012). Thus, conspiracy "involves two elements of intent that shade into each other: each party must have intended to enter into the agreement and the schemers must have had a common intent to commit an unlawful act." *United States v. Alvarez*, 610 F.2d 1250, 1255 (5th Cir. 1980).

Here, the substantive offense—wire fraud—requires a "specific intent to defraud," which is "a conscious, knowing intent to deceive

18

and cheat someone." 5th Cir. Jury Pattern Instructions (Criminal) § 2.57 (2024); *see United States v. Greenlaw*, 84 F.4th 325, 350 (5th Cir. 2023). Thus, "proving conspiracy to commit wire fraud requires proof that [co-conspirators] joined the conspiracy with the specific intent to defraud." *Greenlaw*, 84 F.4th at 339 n.4 (quoting *Brooks*, 681 F.3d at 699). "[T]he existence of a co-conspirator is not only an element of the crime, it is the essence of the crime." *United States v. Pearson*, 667 F.2d 12, 13 (5th Cir. 1982).

In sum, without a shared "common scheme to commit an unlawful goal"—wire fraud—by conspirators who also have a common intent to defraud, the government cannot prove a § 1349 wire fraud conspiracy. *See United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018). The agreement "need not be formal or spoken." *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). But the government "must show circumstances from which a jury could infer beyond a reasonable doubt that there was a 'meeting of the minds to commit'" the charged unlawful act. *United States v. Adkinson*, 158 F.3d 1147, 1153–54 (11th Cir. 1998). No such evidence is present here.

Here, the government failed to prove that Mr. Filline, Rymers, and Hernandez entered an agreement with the specific intent to defraud Farmers Insurance Group. The government's theory was

19

that Mr. Filline conspired with Rymers and Hernandez for them to "get rid of" or destroy the Lincoln Navigator. ROA.1024–25; *see* ROA.21, 377. Mr. Filline then filed the report with Farmers Insurance Group that the car was stolen, which resulted in Farmers paying a claim to the lienholder. ROA.21, 377. The government never argued, much less proved, that Rymers and Hernandez *agreed to commit fraud. See* ROA.21, 377. At most, Rymers and Hernandez agreed to "get rid of" the Navigator, but for nothing in return. *See* ROA.1027, 1032–35. There was no evidence that they took the car understanding that Mr. Filline would later mispresent the car as stolen in order to defraud the insurance company or anyone else.

Rymers did not testify about insurance or assert that he knew taking the car would result in Mr. Filline's lien being paid.[5] *See* ROA.1006–90. Rymers knew Mr. Filline was under financial stress but said he did not know about any missed car payments. ROA.1019, 1026. Mr. Filline also made it clear that he disliked that Navigator. *See* ROA.933, 1023–24, 1207. And Rymers knew that

---

[5] Rymers was not questioned by the insurance investigator, *see* ROA.860–61, and there is no indication his questioning by the deputy fire marshal in 2016 or 2018 addressed any fraud or insurance claims either, ROA.746–47.

Mr. Filline was frustrated that the shocks would cost a couple of thousand dollars to fix. ROA.1019. By contrast, Mrs. Filline loved the Navigator and thought they would eventually fix the shocks. ROA.1133–35, 1152. With the car stolen or destroyed, though, fixing the shocks would not be an option. Rymers was willing to help Mr. Filline get rid of the car even though Mr. Filline did not promise him anything in exchange. ROA.1026.

From these facts, the jury could only speculate that Rymers, Hernandez, and Mr. Filline engaged in a conspiracy to commit wire fraud. In closing, the government did not attempt to describe any conspiracy to *commit wire fraud*. ROA.1199–1220, 1242–48. Instead, the prosecutor described conspiracy generally as simply two people joining "in an agreement to commit *an offense*." ROA.1199 (emphasis added). Then the government pivoted to Mr. Filline's scheme to defraud: that Mr. Filline wanted the vehicle stolen so that Farmers would pay off his lien. ROA.1199. Perhaps the government proved that Mr. Filline himself devised the alleged scheme to defraud. But Mr. Filline was not charged with a substantive wire fraud offense. *See* ROA.22–23. The government brought only a conspiracy charge. But there was no evidence that Rymers or Hernandez agreed to "get rid of" the car for the purpose of committing wire

21

fraud. And "[w]ithout an agreement, there is no conspiracy." *Ganji*, 880 F.3d at 768.

Recognizing that "[p]roof of an agreement to enter into a conspiracy is not to be lightly inferred," courts have vacated conspiracy convictions lacking such evidence. *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971) (vacating drug conspiracy conviction after holding agent improperly introduced inadmissible hearsay statements by an informer); *see also Ganji*, 880 F.3d at 767, 774 (vacating health care fraud conspiracy convictions). For instance, this Court recognizes that proof of individual drug transactions "alone do not constitute a conspiracy" to commit drug trafficking. *United States v. White*, 569 F.2d 263, 267–68 (5th Cir. 1978) (vacating drug conspiracy convictions). Similarly, failure to disclose income, while suspect and possibly violative of a law or rule, is generally insufficient to establish a conspiracy to defeat the lawful functioning of the IRS. *United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998) (vacating conspiracy conviction). In short, suspect or unlawful behavior "X" does not necessarily prove the conspiracy to commit "Y" unlawful act. *See Ganji*, 880 F.3d at 767 (reversing conspiracy convictions based on "concert of action" theory).

Here, an agreement to accomplish "X" (to "get rid of" the car) does not establish a conspiracy to commit "Y" (wire fraud). *See United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) ("Without evidence of an agreement to participate in the larger scheme charged in the indictment, the government proved only that there may have been multiple conspiracies[.]"); *see Kotteakos v. United States*, 328 U.S. 750, 752 (1946) (reversing convictions for one single general conspiracy when the government did not prove one conspiracy but several different ones).

That Rymers and Hernandez completed a necessary task—taking and destroying the car—for Mr. Filline's fraudulent scheme to succeed does not establish a conspiracy either, because there was no evidence that established Rymers or Hernandez had agreed with specific intent to commit wire fraud. *See United States v. Falcone*, 311 U.S. 205, 210 (1940). In *Falcone*, a supplier sold items necessary for unlawful distillation to an illicit distiller. *Id*. The Supreme Court recognized that the "sale may have furthered the object of a conspiracy to which the distiller was a party," but the supplier had no knowledge of that conspiracy. *Id*. So the supplier was not part of it. *Id*.

Thus, it is not enough for the wire fraud conspiracy charge to prove that Mr. Filline asked Rymers to "get rid of" the Navigator or that Rymers and Hernandez worked together to do so. For there to be a conspiracy to commit wire fraud, there must be an agreement to commit *wire fraud*. This means at least one person besides Mr. Filline must have known the object of the conspiracy was to commit fraud and shared with Mr. Filline an intent to defraud. *Cf. Ingram v. United States*, 360 U.S. 672, 678 (1959) (a conspiracy to commit willful evasion of federal taxes cannot be committed unless the parties knew about the tax liability being evaded). The government did not prove beyond a reasonable doubt that such a person existed. Perhaps one could speculate that stealing a car could lead to some insurance fraud, but even reasonable *speculation* "does not constitute proof beyond a reasonable doubt" of an agreement to commit fraud. *White*, 569 F.2d at 268.

A verdict cannot "rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Sanders*, 952 F.3d at 273; *see United States v. Palacios*, 556 F.2d 1359, 1365 (5th Cir. 1977) (vacating drug conspiracy and aiding-and-abetting convictions). Mr. Filline's conviction for conspiracy to commit wire fraud must be vacated "to guard against dilution of the

24

principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *White,* 569 F.2d at 268.

## CONCLUSION

For these reasons, the Court must vacate Mr. Filline's conviction.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,521 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

s/ Kristin M. Kimmelman
KRISTIN M. KIMMELMAN
*Attorney for Defendant-Appellant*

Dated:  July 15, 2025

26